**UNITED STATES of America**

v.

**Zeki SABBAGH and Jack Sabbagh.**

**Crim. No. HM–90–0483.**

United States District Court,
D. Maryland.

May 28, 1993.

ceeding in Nigeria. The defendants contend that these affidavits also conflict with the trial testimony.

On November 6, 1992 and February 19, 1993, the court heard oral argument with respect to the defendants' motion. After carefully considering the parties' arguments and written submissions, as well as the entire record, the court is now prepared to rule. For reasons explained below, the motion for a new trial will be denied.

Richard D. Bennett, U.S. Atty. for D. MD, Stephen S. Zimmermann and Robert R. Harding, Asst. U.S. Attys., Baltimore, MD, for the Government.

David B. Irwin, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, Nathan Lewis, Miller, Cassidy, Larroca & Lewin, Washington, DC, Richard M. Egbert, Boston, MA, Richard J. Landes, New York City, for defendants.

### MEMORANDUM AND ORDER

MALETZ, Senior Judge, sitting by designation.

On March 26, 1992, defendant Zeki Sabbagh and his son, defendant Jack Sabbagh, were found guilty by a federal jury of conspiracy to distribute one kilogram or more of heroin, and conspiracy to violate the money laundering laws of the United States. In addition, Zeki Sabbagh was convicted of being part of a second heroin distribution conspiracy and six substantive counts of money laundering.[1] The defendants now jointly move, prior to sentencing, for a new trial on the basis of certain post-trial statements made by a government witness, Raymond Obilo, that are inconsistent with his trial testimony. The defendants also base their motion on the government's alleged failure to disclose to the defense affidavits executed by Obilo and another government witness, Jude Mbionwu, which the government has submitted in an extradition pro-

### I. Background

The defendants are owners and operators of an international cosmetics business, Saba Distributing, located at 6 West 14th Street in New York City. The government's essential contention at trial was that the defendants used this business to launder millions of dollars of drug money brought to them by numerous heroin traffickers and in so doing became voluntary participants in the drug conspiracies they served. The testimony and evidence produced against the defendants can be summarized as follows.

### A. Jude Mbionwu

Jude Mbionwu testified that between June of 1988 and December 1989, he was part of a heroin trafficking conspiracy whose members included the Nigerian based suppliers, Greg and Sonny Odilibe and John and Chris Okpala, as well as Maryland based distributors such as Vincent Newby and Allen Smallwood and numerous couriers. (Tr. at 990–1027)[2] Mbionwu's role was essentially that of a middleman. (Tr. at 1007) He would arrange to have the heroin picked up from the couriers and delivered to the distributors and for the profits to eventually reach the suppliers in Nigeria. (Id.)

Mbionwu testified that he and his assistants laundered over two million dollars through Saba Distributing. (Tr. at 1224) According to Mbionwu, the defendants accomplished this primarily by holding on account large sums of cash brought by Mbionwu and his assistants, and by then applying

---

**1.** The defendants were also acquitted of several counts. The jury found Jack Sabbagh not guilty of the second heroin distribution conspiracy charge and Zeki Sabbagh not guilty of two substantive money laundering counts.

**2.** Citations to the trial transcript are in the form "Tr. at ____."

those monies to cosmetics orders placed by business entities which Mbionwu and his co-conspirators had established in Nigeria. (Tr. at 1075–1093) In this manner, the large and unwieldy cash proceeds were converted to something of value—cosmetics—which could be more safely exported to Nigeria, and once there, sold by the Okpalas and Odilibes for an additional profit.[3] Files for each of the business entities named by Mbionwu were found in the defendants' offices. These records alone demonstrated that the defendants sold Mbionwu, the Okpalas and the Odilibes over 2 million dollars in cosmetics. (Tr. at 1142, 3057)

Mbionwu testified in great detail as to his deliveries of cash to the defendants. He stated that the amounts ranged from $20,000 to $200,000 and that he would bring the money mainly in $10 and $20 denominations in shoe boxes or a suitcase. (Tr. at 1074, 1075) The defendants would count the money either by hand or with the use of a money counter, make a notation of the amount on a handwritten ledger, and store the cash in one of several safes in their offices. (Tr. at 1078, 2023) Mbionwu testified that it was understood that the defendants would not file an IRS Form 8300 as is required for every cash transaction over $10,000. (Tr. at 1077)

Mbionwu further testified as to other laundering methods employed by the defendants. For a small fee, the defendants would exchange Mbionwu's small denomination currency for $100 bills which were safer and easier for Mbionwu and his couriers to hide on their persons or in their luggage and travel with out of the country. (Tr. at 1094–1096) Mbionwu also testified that the defendants regularly hid cars, furniture and other items purchased with drug proceeds in Ni-

gerian-bound cosmetic containers. (Tr. at 1115–1120; 1139–1143; 1166–1179) To ensure that the true contents of these containers were not discovered, the defendants falsified the bills of lading by omitting any reference to the non-cosmetic items.[4] (*Id.*)

Finally, Mbionwu made it clear in his testimony that the defendants knew that they were dealing with heroin traffickers. (Tr. at 1606–1607) Mbionwu stated that he had separate conversations with each of the defendants in which he described his own drug trafficking activities as well as the roles of the Okpalas and Odilibes. (Tr. at 1100–1102; 1144–1148; 1606–1607) According to Mbionwu, the defendants not only continued doing business with him after hearing this, but on one occasion Zeki Sabbagh even informed him that one of the defendants' other customers, Chuka Asudonya, was looking for a buyer for his freshly imported heroin. (Tr. at 1284–1288)[5]

## B. *Raymond Obilo*

Raymond Obilo testified that between 1988 and 1989, he worked as an "errand boy" for Mbionwu, picking up and delivering heroin, and bringing money to the defendants' offices in New York. (Tr. 2180–2183)[6] Like Mbionwu, Obilo stated that his deliveries of cash ranged from $10,000 to $250,000 and that the defendants would keep these amounts on account for subsequent purchases of cosmetics by the Odilibes and Okpalas. (Tr. at 2183–2184; 2192)[7]

Significantly, for the purposes of this motion, Obilo testified that on one of his trips to the defendants' offices, Zeki Sabbagh handed him a package containing heroin. (Tr. at 2260) The package, according to Obilo, was

---

**3.** Customs Agent Vincent DiGilio explained to the jury that it is illegal to carry more than $10,000 out of the country without filling out a Customs form. (Tr. at 1635)

**4.** Mbionwu additionally testified that on one occasion he and Zeki Sabbagh packed $50,000 into a laundry detergent box which Mbionwu then took to Nigeria hidden in his suitcase. (Tr. at 1230–1234)

**5.** Both defendants were convicted of being part of Mbionwu's heroin distribution conspiracy, as well as a money laundering conspiracy whose

members included, among others, Mbionwu, the Odilibes, and the Okpalas.

**6.** Obilo and Mbionwu both testified that in 1989 Obilo took over Mbionwu's role in the conspiracy. (Tr. at 1031, 2217)

**7.** Mbionwu's and Obilo's testimony was also corroborated by Obilo's wife, Joanna Jones Obilo. Mrs. Obilo testified that she made several trips to the defendants' offices with Mbionwu and/or her husband to deliver drug money. (Tr. at 2752–2765)

wrapped in black tape and had been left for him by an individual known as Extobest. (Tr. at 2260–2261) Obilo testified that he did not know if Zeki Sabbagh knew what was in the package and that he did not discuss its contents with him. (Tr. at 2259, 2656) Obilo further testified that he never discussed drugs with either of the defendants. (Tr. at 2656)

### C. *Vincent Emerson Thomas*

Vincent Emerson Thomas testified to having been part of a separate heroin trafficking conspiracy from 1985 to 1990. Thomas, along with his partners Antoine Jones and Chuka Idusuyi, purchased heroin from Nigerian suppliers, such as Bright Igwe, Greg Uanseru, and Akin Adetifa, and then sold it to local Baltimore distributors. (Tr. at 160–179)

Thomas testified that he too laundered several hundred thousand dollars of drug proceeds by purchasing cosmetics from the defendants. (Tr. at 203–243) [8] According to Thomas, he started doing business with the defendants after Greg Uanseru informed him that it was "safe to do large cash transactions with Saba Distributing." (Tr. at 197) Thomas also testified that on numerous occasions he "purchased" $100 bills from the defendants. (Tr. at 213–216, 222, 227, 228, 233–235)

In addition, Thomas recounted certain statements by Zeki Sabbagh which indicated Sabbagh's knowledge of the criminal activities of his customers. According to Thomas, Sabbagh complained that his Nigerian customers profit on both ends of the transaction since they buy heroin for $30,000, sell it for $130,000, and then use the proceeds to buy cosmetics from which they then make an additional profit. (Tr. at 226) Thomas' brother, Rupert Francis Thomas, was also present at the time of this alleged statement. He remembered Zeki Sabbagh complaining about Nigerian heroin traffickers buying cosmetics in great quantities and then dumping them on the African market thereby depressing the price. (Tr. at 1464–1468) Thomas' girlfriend, Audrey Franklin, also testified about this incident, recalling that Thomas had been very concerned that his brother may have been tipped off about his involvement in the heroin trade as a result of Zeki Sabbagh's remarks. (Tr. at 1834–1836) [9]

### D. *Frank Igbonwa*

Frank Igbonwa was part of neither the Mbionwu nor the Thomas conspiracies, but nevertheless supplied significant testimony relating to the issue of Zeki Sabbagh's knowledge of his customers. Igbonwa testified that, between September of 1989 and May of 1990, he made four separate trips to Saba Distributing, in which he deposited over 1.5 million dollars in drug proceeds from Arthur Benson, the Nigerian heroin trafficker he worked for. (Tr. at 732–795) Benson was an associate of one of the defendants' biggest customers, Bright Igwe, who operated a cosmetics business in Nigeria known as Sybrite. (Tr. at 761) Igbonwa testified that the monies he brought were deposited in the Sybrite account and that these monies were then applied to Sybrite's various cosmetic orders. (Tr. at 761, 762) [10]

As to Zeki Sabbagh's knowledge, Igbonwa testified that during his third trip to the defendants in January of 1990, Sabbagh told him that United States Customs agents had personally informed him that some of his Nigerian customers were heroin traffickers. (Tr. at 776, 786–787) According to Igbonwa, Sabbagh further stated that the agents had asked for his help, specifically for his business documents, and that he had refused.

---

8. A file for Thomas' business entity, G & E Enterprises, was found in the defendants' offices.

9. Only Zeki Sabbagh was convicted of being part of the Thomas heroin distribution conspiracy. In addition, Zeki Sabbagh's conviction on two of the substantive money laundering charges, Counts 6 and 7, related to monies which Thomas' girlfriend allegedly delivered to Zeki Sabbagh in November and January of 1990.

10. Mbionwu, Lawrence Ejim and Jason Nwankwo testified that Bright Igwe was also a heroin trafficker laundering money through the defendants. (Tr. at 1229–1230 [Mbionwu], 2014–2031 [Ejim], 951–957 [Nwankwo]) Invoices introduced into evidence disclosed that Sybrite and Jay Igwe, an associate of Bright Igwe, had purchased 1.9 million dollars of cosmetics from the defendants. (Tr. at 3059)

Igbonwu testified that he commended Sabbagh for his refusal and that Sabbagh then displayed to him a cosmetics box containing one million dollars that he was planning to send Benson. (Tr. at 786–787)

### E. *Agent Plummer*

Special Agent Eldred Plummer of the Drug Enforcement Administration testified that, while working in an undercover capacity, she met with Zeki Sabbagh at the defendants' offices on March 27, 1991, and again on April 23rd of that year. Plummer was accompanied on both occasions by Chi Chi Okoye, who had previously been introduced to Sabbagh by her cousin Jude Mbionwu. (Tr. at 3318, 3331) On the first of these visits, Plummer and Okoye brought a suitcase filled with $20,000 in small denomination currency. They informed Sabbagh that the purpose of their visit was to have the money converted into $100 bills so that it could be hidden in Plummer's purse and taken on a flight to Nigeria departing that evening. (Tr. at 3326–3334, 3356–3357) While Sabbagh ultimately performed this service for a $600 fee, he warned Plummer that this was a dangerous way of getting the money out of the country and urged her to instead allow him to "wire" the money overseas.[11] (Tr. at 3334–3342) Sabbagh instructed the women that if they were to get caught at the airport, they should not mention his name. (Tr. at 3334)[12]

On their second visit to the defendants' offices, Plummer and Okoye brought $30,000 which Zeki Sabbagh subsequently "wired" to Nigeria.[13] (Tr. at 3381, 3422) On this occasion, Plummer carried a recording device on her person and the approximately one hour conversation that took place was recorded and played for the jury. (Government Ex. T.

3) In addition to again discussing the dangers of smuggling money via international flights, the parties talked about Jude Mbionwu's recent arrest and incarceration on heroin charges. Sabbagh expressed no surprise at this development, and suggested that Mbionwu's greed had gotten the better of him. (Government Ex. Tr. 3 at 17)

### F. *Jack Sabbagh*

Defendant Jack Sabbagh took the witness stand in his own defense. He testified that while he and his father had long been aware that Nigerian heroin traffickers had infiltrated the cosmetics industry, there was nothing about any of their Nigerian customers to arouse their suspicions. (Tr. at 4478–4481)

Sabbagh freely admitted that he and his father exchanged small denomination currency into $100 bills for their clients and their clients' friends. (Tr. at 4156–4160, 4548–4566) He was unable to explain, however, why supposedly legitimate businessmen would pay for such a service rather than having a bank do it at no charge. (Tr. at 4559–4565)

Sabbagh also admitted that he and his father falsified bills of lading so as to omit cars, furniture and other items that were loaded onto their clients' cosmetics containers. He testified that he did not believe there was "anything tremendously illegal" about this practice. (Tr. at 4174, 4356)

### II. *The Defendants' Motion*

By letter dated June 29, 1992, the United States Attorney's Office for the District of Maryland informed the defendants of certain post-trial statements made by Raymond Obilo that are inconsistent with aspects of his trial testimony. Obilo made the statements

---

11. Zeki Sabbagh would "wire" money for a person such as Plummer by taking her cash, crediting the account of one of his Nigerian customers for the amount she provided, and by then instructing that customer to release an equivalent amount of Nigerian currency to Plummer, or one of her associates, in Nigeria. (Tr. at 3424–3425)

12. Plummer testified that Sabbagh told them of a Nigerian who had been arrested at the airport three months earlier with $96,000 that Sabbagh had converted for him. (Tr. at 3355–3356) Cus-

toms Inspector Vincent DiGilio testified that in December of 1990, he arrested a Nigerian male attempting to fly out of JFK Airport with slightly more than $97,000. (Tr. at 1642–1650) DiGilio testified that this was the only arrest involving such an amount between December of 1990 and February of 1991. (Tr. at 1642)

13. Zeki Sabbagh's conviction on four of the substantive laundering charges, Counts 8 through 11 of the indictment relate to this transaction.

while being debriefed for the prosecution of a local Baltimore drug organization. Specifically, Obilo informed the government that he currently has $100,000 of profits from narcotics trafficking deposited in a bank in Germany. The defendants assert that this is entirely inconsistent with Obilo's trial testimony that he had only $20,000 at the time of his arrest. (Tr. at 2334)

In addition, Obilo also informed the government that from 1985 to 1987, he made approximately $750,000 by acquiring "currency estimates" from Nigerian students. According to Obilo, the Nigerian government, during this time period, subsidized Nigerian students studying in the United States by providing an exchange rate of one American dollar to one Nigerian nira, as opposed to the five-to-one rate then currently available. Eligible students were issued currency estimates, which along with a statement of expenses from an American university, could be taken to a bank and used to exchange dollars at the more favorable exchange rate. Obilo further stated that he sent the $750,000 to his father's London business associate, who is still presumably holding the money for him.

While Obilo testified about his purchase of currency estimates at trial, his account of the amounts he made, and what he did with those amounts, was significantly different. During his trial testimony, Obilo stated that he had made only $150,000 from the purchase of estimates and that he then lost this money in an unrelated business venture in Nigeria. (Tr. at 2370–2378)

The defendants contend that Obilo's post-trial statements regarding the $100,000 and $750,000 accounts calls his credibility and

entire testimony into question. A new trial is therefore warranted, according to the defendants, because only Obilo placed heroin in either of the defendants' hands, and as such he was the government's "star witness." Memorandum in Support of Preliminary Motion for a New Trial at 3. *Id.*[14]

The defendants also base their motion for a new trial on the government's alleged failure to disclose to them two affidavits, one sworn to and executed by Obilo six days prior to his taking the witness stand (the "Obilo affidavit"), and the other sworn to and executed by Mbionwu immediately following the completion of his testimony (the "Mbionwu affidavit"). Both affidavits were drafted by government attorneys and submitted to a Nigerian court as part of the government's efforts to extradite Greg Odilibe. The defendants contend that both affidavits should have been disclosed pursuant to the Jencks Act, 18 U.S.C. § 3500, and that had the government done so, defense counsel would have "destroyed" Obilo and Mbionwu on cross-examination by pointing to the many inconsistencies between the affidavits on the one hand and their trial testimony on the other. Defendants' Supplemental Memorandum on Motion for a New Trial at 17.[15]

### III. *Analysis*

#### A. *Obilo's Post Trial Statements*

■ In general, defendants seeking a new trial on the basis of newly discovered evidence must meet the following requirements:

(a) The evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the

---

14. In support of this argument, the defendants further contend that it is extremely unlikely that Obilo actually earned $750,000 by purchasing estimates from Nigerian students and that he instead probably made this money through narcotics trafficking that he has not admitted to. For purposes of this motion, the court will assume *arguendo* that the defendants are correct in this contention. Accordingly, the defendants' request that the court direct the government to conduct an investigation regarding Obilo's explanation of the $750,000, and to disclose to the defendants all material relating to Obilo will be denied as unnecessary.

15. Without stating so directly, defense counsel strongly suggest that they only learned of the affidavits as a result of an article which appeared in the July 27, 1992 issue of a magazine published in Nigeria called *The African Guardian*. See Defendants' Reply to the Government's Response to the Motion for a New Trial at 4. Reference to the Mbionwu affidavit, however, was made in open court during Mbionwu's last day of testimony. (Tr. at 1622) The court, though, for purposes of this motion, will assume that the defense was truly unaware of either of the affidavits until after the completion of the trial.

movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Bales,* 813 F.2d 1289, 1295 (4th Cir.1987) *(quoting Mills v. United States,* 281 F.2d 736, 738 (4th Cir.1960).

There has been conflict among the circuits as to whether the above standards should be modified when the newly discovered evidence indicates that a government witness committed perjury. The Seventh Circuit rule, commonly referred to as the *"Larrison* test," requires defendants in such cases to merely demonstrate that an acquittal "might" occur on retrial rather than "probably." *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928). While the *Larrison* test has been recognized by at least one commentator to be the majority rule, *see* C. Wright, 3 *Federal Practice and Procedure,* § 557.1 at 344 (1993), the current case law indicates otherwise. The Second and Ninth Circuits have expressly rejected the *Larrison* test, applying the same probability standard to evidence of perjury as is employed with any other new evidence. *See United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976); *United States v. Krasny,* 607 F.2d 840, 844–45 (9th Cir.1979), *cert. denied,* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980). In addition, recent decisions of the Third, Fifth, Seventh and Eighth Circuits call into question the continuing va-

lidity of the test. *See United States v. Massac,* 867 F.2d 174, 178 (3d Cir.1989); *United States v. Nixon,* 881 F.2d 1305, 1311–12 (5th Cir.1989); *United States v. Mazzanti,* 925 F.2d 1026, 1030 (7th Cir.1991); *United States v. Tierney,* 947 F.2d 854, 862 n. 4 (8th Cir. 1991).[16]

The Fourth Circuit has applied the *Larrison* test on only one occasion, and in so doing, explicitly limited its application to the particular facts of that case. *United States v. Wallace,* 528 F.2d 863, 866 (4th Cir.1976). The *Wallace* court noted that the witness who had perjured himself had supplied the only proof of an essential element of the crime charged and "reserve[d] for an appropriate case any decision as to what degree of certainty should be applied when the [perjured] testimony [is] only collateral, cumulative or corroborative." *Id.* at 866, n. 3.

■ The Fourth Circuit has yet to revisit its decision in *Wallace.* It is therefore not entirely clear what test should be applied to Obilo's post-trial statements regarding his off-shore bank accounts which are plainly collateral to the issue of the defendants' guilt or innocence. While the court strongly believes that in light of the recent authorities discussed above, the Fourth Circuit would not apply the *Larrison* test to the facts of this case, resolution of this issue is not required here. Even when judged under the less stringent *Larrison* test, Obilo's post-trial statements do not warrant a new trial.[17]

The court finds that, contrary to the defendants' assertions, Obilo was not a "star witness" whose testimony was vital to the gov-

**16.** Defendants contend throughout their motion papers that Obilo's post-trial statements satisfy the general probability standard for newly discovered evidence. It is not until defendants' letter of April 2, 1993 that they suggest for the first time that the *Larrison* test may be applicable here.

**17.** The court's belief that the Fourth Circuit would not apply the *Larrison* test in this case is also based on the Fourth Circuit's recent holding in *United States v. Custis,* 988 F.2d 1355 (4th Cir.1993). In holding that a new trial in that case was unwarranted, the Fourth Circuit quoted with approval the Second Circuit's admonition that "motions for a new trial based on [newly discovered] impeaching evidence ... should be granted only with great caution and in the most

extraordinary circumstances." 988 F.2d at 1360 (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992)). Since evidence that a witness has committed perjury on a collateral issue only serves on retrial to impeach the credibility of that witness, there is no basis to treat such evidence differently from any other type of impeachment evidence. *See United States v. White,* 972 F.2d 16, 22 (2d Cir.1992) ("The district court correctly held that the newly discovered evidence that Smith may have lied about his drug use in 1990 and 1991 would have been merely the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial."), *cert. denied,* —— U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992).

ernment's case. While the defendants are correct that Obilo was the only witness to place heroin in the defendants' hands, actual possession of narcotics is not an element of any of the crimes the defendants have been found guilty of. The defendants' knowing participation in the money laundering and narcotics conspiracies is established, independent of Obilo's testimony, by the many other witnesses who testified against them and by the documentary evidence presented. Accordingly, even assuming that the jury would have disregarded Obilo's entire testimony had it known of his post-trial statements, the court does not believe that the verdict might have been different. *See United States v. Mazzanti*, 925 F.2d at 1030 ("Moreover, there was sufficient independent evidence—indeed overwhelming evidence—of the existence of the conspiracy and of Mr. Mazzanti's participation in that conspiracy." New trial motion denied under the *Larrison* test); *United States v. Taglia*, 922 F.2d 413, 416 (7th Cir.1991) ("... [E]ven if the jury had given no weight whatsoever to Blessing's testimony, it would have convicted the defendants. The crucial evidence against them was not Blessing's testimony but the tapes." Motion for new trial denied under the *Larrison* test), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).[18]

Obilo's collateral post-trial statements also do not warrant a new trial because Obilo's credibility was effectively and relentlessly called into question at trial. In addition to the fact that Obilo was shown to be a heroin trafficker attempting to avoid a long prison term, defense counsel aggressively cross-examined him specifically with respect to the

issue of his profits from narcotics trafficking and what had become of them. (Tr. at 2361–2382) Defense counsel's questions highlighted the dubious nature of Obilo's testimony that he simply gave away hundreds of thousands of dollars to his siblings and friends. *Id.* Accordingly, Obilo's post-trial statements regarding his off-shore bank accounts are nothing more than the "sort of cumulative impeachment that is routinely held insufficient to warrant a new trial." *United States v. White*, 972 F.2d at 22.

Finally, having determined that Obilo's post-trial statements fail to satisfy even the *Larrison* "might" standard, it is unnecessary for the court to consider the issue of whether the government knew, or should have known, that Obilo was testifying falsely. Even if such was the case, a new trial would not be warranted because there is not a "reasonable likelihood" that Obilo's false testimony "could have affected the judgment of the jury." *United States v. White*, 972 F.2d at 21; *United States v. Sanchez*, 969 F.2d at 1414.[19]

**B.  *The Obilo Affidavit***

■ Under the Jencks Act, the government is required at trial to provide a criminal defendant with prior written or recorded statements of its witnesses that are related to the subject matter of their testimony. The government admits that disclosure of the Obilo affidavit was required under the Jencks Act and for purposes of this motion, the government further concedes that it failed to produce the affidavit through oversight. Government's Response to Motion for New Trial for Jencks Act Violation at 2.[20]

---

**18.** The defendants' reliance on the Second Circuit's decision in *United States v. Wallach*, 935 F.2d 445 (2d Cir.1991), is misplaced. The court there found a new trial to be warranted because the "centerpiece of the government's case" perjured himself during his direct examination. *Id.* at 457. Unlike Obilo, the witness at issue in *Wallach* was one of only two prosecution witnesses who "linked the defendants to illegal conduct," and therefore was found by the court to have been "essential" to the prosecution. *Id.* at 455, 458.

**19.** The fact that the government promptly disclosed Obilo's post-trial statements to the defense strongly indicates that the government was not

aware of any false testimony on Obilo's part at trial.

**20.** While the two Assistant United States Attorneys who prosecuted this case, Robert R. Harding and Stephen S. Zimmermann, make these concessions for the purposes of this motion, they nevertheless contend that it is their recollection that the Obilo affidavit was provided to defense counsel prior to Obilo taking the witness stand. *See* Government's Response to Motion for New Trial for Jencks Act Violation at 2. However, since neither Harding nor Zimmermann have any "documents memorializing the production of the affidavit, [they] will assume *arguendo* that the affidavit was not produced prior to Obilo's testi-

A violation of the Jencks Act is not automatically grounds for a new trial. The Supreme Court has held that the harmless error doctrine is applicable to Jencks Act violations, although it has stressed that courts must strictly apply the doctrine in reviewing such violations. *Goldberg v. United States,* 425 U.S. 94, 112 n. 2, 96 S.Ct. 1338, 1349 n. 2, 47 L.Ed.2d 603 (1976). The Fourth Circuit, in turn, has stated that "a violation of the Jencks Act should be excused only where it is perfectly clear that the defense was not prejudiced." *United States v. Crowell,* 586 F.2d 1020, 1028 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979). Having reviewed Obilo's affidavit, his trial testimony and the entire record, it is perfectly clear to the court that the defendants were not prejudiced by not having the affidavit at trial.

Like his post-trial statements to the government, Obilo's affidavit in no way exonerates the defendants. Indeed, the affidavit, which as discussed above, was drafted for the purpose of extraditing Greg Odilibe from Nigeria, relates primarily to Obilo's dealings with Odilibe and as such scarcely refers to the defendants. Of the 15 numbered paragraphs, only four sentences in paragraphs 9 and 11 discuss the defendants.[21]

The defendants' contention that they have been prejudiced because of the affidavit's significant impeachment value is without merit. The affidavit does not materially deviate from Obilo's trial testimony. The primary inconsistency alleged by the defendants is that while Obilo depicted himself as nothing more than Mbionwu's errand boy at trial, he appears in the affidavit as a "major player in the narcotics business" who deals directly with the Nigerian based suppliers, Greg and Sonny Odilibe. Defendants' Supplemental Memorandum on Motion for a New Trial at

2. In making this argument, however, defendants mischaracterize Obilo's trial testimony by focusing only on Obilo's description of his initial dealings with Mbionwu. Although Obilo testified that he began his career in heroin trafficking in 1988 as a courier "errand boy" for Mbionwu, he went on to testify that he separated from Mbionwu in early 1989 and began working directly with Greg and Sonny Odilibe. (Tr. at 2217) Obilo further testified that he took on a role similar to that of Mbionwu's; recruiting and overseeing couriers who would receive and distribute the heroin and bring the proceeds to the defendants for laundering. (Tr. at 2268)[22]

Similarly without merit, is defendants' contention that the affidavit and trial testimony are inconsistent with respect to the number of trips that Obilo made to New York to pick up heroin. The defendants assert that at trial Obilo claimed to have made only two or three such trips but that in paragraph 7 of the affidavit he states that he made "many." In this instance, the defendants mischaracterize the affidavit. After stating in paragraph 7 that he made "many" trips to New York to pick up heroin, Obilo goes on in that paragraph to describe each such trip, of which there were four. Thus, the actual discrepancy here, to the extent one exists, is that at trial Obilo stated that he made two or three trips while in the affidavit he states that he made four.

The defendants also contend that whereas Obilo states at paragraph 9 of the affidavit that he took approximately $750,000 to Zeki Sabbagh for transfer to Greg Odilibe, the most that he ever testified to at trial was $250,000. The preceding two sentences of paragraph 9, however, made clear that the $750,000 Obilo is referring to is the total amount of money which he brought to the

---

mony." *Id.* The court will make the same assumption.

21. Paragraphs 9 and 11 provide:
    In late 1988, your affiant [made] a number of trips to Zeki Sabbagh in New York City at the direction of Jude Ugochukwo Mbionwu. Your affiant would take between $10,000 and $250,000 each trip. Specifically, for Greg Odilibe, your affiant took approximately $750,000 to Zeki Sabbagh for transfer to Greg Odilibe.

In approximately January or February 1989, Jude Ogochukwo Mbionwu gave your affiant money to take to Zeki Sabbagh in New York City. Mbionwu said the money was for Greg Odilibe.

22. Obilo also described his rise in the drug trafficking world in three trials prior to this case. Transcripts of Obilo's testimony in each of these cases were available to the defendants.

defendants on Greg Odilibe's behalf and not to any one single delivery. *See supra* at n. 21. Thus, when read as a whole, paragraph 9 is consistent with Obilo's trial testimony that he made as many as 15 to 20 trips to the defendants to deposit money and that he took as much as $250,000 on any one trip. (Tr. at 2183–2184) (Obilo was not asked at trial either by the government or by the defense to total the amount of money he delivered to the defendants.)[23]

As demonstrated by the above, the inconsistencies raised by the defendants are totally without substance. Accordingly, the defendants have failed to establish any prejudice from the government's failure to produce the affidavit. *United States v. Sink,* 586 F.2d 1041, 1051 (5th Cir.1978), ("Under the Jencks Act ... the memorandum report was clearly a 'statement' as to Agents Stebbins and Connelly. Yet comparing the report and the agents' trial testimony discloses no substantial deviation. Therefore, we agree with the trial court that the government's failure to produce the report at trial was harmless error."), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Sasser, II,* 971 F.2d 470, 481 (10th Cir.1992) ("Based on our review of the two presentence reports, we conclude that the failure to disclose them, if it was error, was harmless. Nothing in either report is dramatically or even substantially inconsistent with the evidence at trial.").

In concluding that the defendants were not prejudiced here, it also bears noting that the defendants had ample material available with which to impeach Obilo's credibility. During the year preceding the defendants' trial, Obilo testified extensively about his involvement in narcotics trafficking in three criminal trials. Transcripts of his testimony in these cases were available to the defense, as were Obilo's plea agreement and an accompanying statement of facts. While defense counsel did not utilize all of these materials, the two-day cross-examination of Obilo was in the court's view vigorous, exhaustive and extremely effective. Under these circumstances, the court is unable to see what additional benefit the defendants would have received from the six-page affidavit at issue. *See United States v. Crowell,* 586 F.2d 1020, 1028 (4th Cir.1978) ("More significantly, however, Foster's credibility was thoroughly impeached so that any additional attack would have been too little purpose.").[24]

### C. *The Mbionwu Affidavit*

█ In contrast with its position with respect to the Obilo affidavit, the government strongly contends that it was not obligated to disclose the Mbionwu affidavit to the defendants. As stated above, the affidavit was not actually signed by Mbionwu until he completed his trial testimony. The government further asserts that Mbionwu did not "adopt" or "approve" the affidavit prior to signing it, and that as such the affidavit was not a disclosable "statement" under the Jencks Act. *See* 18 U.S.C. § 3500(e)(1).

As the defendants correctly point out, however, the government's present position is inconsistent with a statement made by Assistant United States Attorney Zimmermann on

---

**23.** The defendants' other two alleged inconsistencies relating to whether Obilo personally handled narcotics and the number of trials he has testified in are also plainly without merit. Entirely consistent with his affidavit, Obilo testified that while working for Mbionwu he picked up drugs "about two or three times." (Tr. at 2661) Obilo's statement at trial that "I do not touch drugs" (Tr. at 2389), which defendants now focus on, was expressly limited by Obilo to the time period after his breakup with Mbionwu (Tr. at 2390, 2661); it was not as defendants now contend a "categorical" denial. Defendants' Supplemental Memorandum at 13.

Further, Obilo's statement in the affidavit that he has testified at two trials is not inconsistent with his trial testimony that this was his fourth case as a witness. As the defendants are well aware, in between signing the affidavit and testifying in this case, Obilo testified in the prosecution of Alvin Jack.

**24.** *See also, United States v. Hill,* 976 F.2d 132, 142 (3d Cir.1992). In affirming the district court's denial of the defendant's motion for a new trial, the Third Circuit stated as follows:

When undisclosed Jencks material is merely repetitious and/or cumulative of evidence available to the defendant at trial, the Jencks error can be deemed harmless, especially where the undisclosed pretrial statements do not contain impeachment material that would add to an already effective cross-examination of a key witness.

Mbionwu's last day of testifying, Monday, February 18, 1992. The preceding Friday, Zimmermann telephoned the court's chambers and requested that a telephone conference with defense counsel be arranged because of the government's desire to meet with Mbionwu in connection with his affidavit (pursuant to a court order, the government was not permitted to speak with Mbionwu during the course of his testimony). The court denied the government's request, and brought the matter to the attention of the defense at the beginning of the Monday trial session. At that time, the following colloquy took place between Zimmermann and the court:

THE COURT: Second, this past Friday my secretary received a call, I think from you, Mr. Zimmermann.

MR. ZIMMERMANN: Yes, Your Honor.

THE COURT: About requesting that I arrange or we arrange a telephone conference with Mr. Egbert with respect to several Assistant United States Attorneys obtaining an affidavit from the witness now under cross-examination, Mr. Mbionwu. Am I correct?

MR. ZIMMERMANN: Yes Your Honor. It would have been one Assistant U.S. Attorney to *swear out an already existing affidavit.*

Tr. at 1622 (emphasis added).

It would strongly appear from Zimmermann's above statement that Mbionwu had in fact adopted or approved at least a portion of the affidavit prior to the start of his testimony. Accordingly, for the purposes of this motion, the court will assume *arguendo* that the affidavit was Jencks material and that it should have been produced.

Pursuant to an order of the court dated December 29, 1992, the parties have submitted memoranda with respect to the issue of whether the defendants were prejudiced by not having the Mbionwu affidavit at trial. As with the Obilo affidavit, the defendants again base their claim of prejudice on the alleged inconsistencies between the affidavit and the trial testimony. Again, however, careful comparison of the affidavit and the testimony demonstrates that the claim is baseless.

The defendants' initial and most dramatic claim is that in stark contrast to Mbionwu's trial testimony, the "affidavit never state[s] that Mbionwu ... sent drug proceeds to Odilibe through the Sabbaghs." Defendants' Memorandum Concerning Prejudice at 8. The defendants, however, are plainly mistaken in this assertion. Paragraph 14 of the affidavit states as follows:

When your affiant was in Nigeria in December, 1988 through January 1989, Greg Odilibe told your affiant that the heroin Sonny Odilibe brought into the United States in December 1988 was from him. Greg Odilibe also told your affiant that he needs more money to send more drugs into the United States. In January 1989, your affiant returned to the United States, travelled to Baltimore, Maryland, and picked up approximately $80,000 from Thaddeus "Abu" Shakir. Your affiant returned to New York City, and paid Sonny Odilibe $40,000 at the Remington Hotel. *The remaining money was deposited to an account at Saba Distributing and at least a portion of that ultimately went to Greg Odilibe.* Greg Odilibe told your affiant that Sonny Odilibe had given Greg Odilibe his share of the money.[25] (Emphasis added.)

The defendants also contend that Mbionwu's testimony is at odds with his affidavit with respect to his handling of drugs. The defendants correctly assert that in paragraph 9 of the affidavit Mbionwu states that he "picked up heroin for Chris Okpala from couriers other than Sonny Odilibe." The defendants are also correct in their assertion that Mbionwu testified that he would avoid coming into contact with heroin by arranging for people to pick it up from the international

25. In drafting their memorandum, defense counsel apparently relied upon excerpts of the Mbionwu affidavit that were published in the *African Guardian*. *See,* Supplemental Attachment to Defendants' Memorandum Concerning Prejudice. As defense counsel acknowledge, the *African Guardian* excerpts omit certain paragraphs and sentences, such as the one emphasized above, that appear in the original of the affidavit. *Id.* Nevertheless, defense counsel stated at oral argument that they continue to stand behind all of the arguments made in the memorandum.

couriers and deliver it to the local distributors. (Tr. at 1026) Critically, however, the defendants ignore Mbionwu's testimony that when he first became involved with narcotics trafficking in the summer of 1989, he personally picked up heroin from the couriers and that he stopped doing so "after the first few times." (Tr. at 1006–1009) Thus, when read as a whole, Mbionwu's testimony is consistent with his affidavit in regard to his handling of drugs.[26]

Similarly without merit is the defendants' assertion that Mbionwu has rendered conflicting versions of Greg Odilibe's role in the conspiracy. Mbionwu did not, as the defendants now suggest, testify that Odilibe was only a courier. To the contrary, Mbionwu testified that after starting as a courier in late 1988, Odilibe by the beginning of 1989 was "sending people to the States ... on [his] behalf." (Tr. at 1007–1008) Moreover, the affidavit does not, as the defendants also suggest, merely depict Odilibe as a supplier. Paragraph 11 of the affidavit recounts an incident in the fall of 1988 when Greg Odilibe brought 200 grams of heroin to New York. Mbionwu's affidavit and testimony are thus consistent with respect to Odilibe's evolving role in the conspiracy.

The defendants also assert that Mbionwu has provided inconsistent accounts of the amount of heroin that Sonny Odilibe imported into New York City in July of 1988. Defendants contend that Mbionwu testified that he brought 400 grams from Sonny Odilibe in July 1988, but that it is stated at paragraph 7 of the affidavit that Sonny imported 600 grams on that occasion. The defendants, however, ignore the remaining portion of paragraph 7 which reconciles this asserted inconsistency. Mbionwu states at the paragraph's conclusion that Sonny Odilibe had already disposed of 200 grams of heroin in New York, prior to providing Mbionwu the remaining 400.[27]

The defendants' final contention is that there are four people who Mbionwu named as couriers in the affidavit who he did not refer to during his trial testimony and six people who he mentioned during the trial that are not referred to in the affidavit. The four people allegedly unique to the affidavit are "Fabro," "Baba," "Sylva," and "Major." The six people allegedly named only during the trial are "Onyiudu," "Obilo," "Emeka," "Okumko," "Addy," and "Tussy."

As to several of these people, the defendants are mistaken. "Fabro" was named in the trial as well as the affidavit (Tr. at 1112) and "Obilo" and "Onyiudu" appear in the affidavit at paragraphs 12 and 18 as well as in the trial testimony.

Further, the other three persons allegedly unique to the affidavit were discussed by Mbionwu during his previous testimony in the trial of Ike Ilodi. The transcript of Mbionwu's testimony in the Ilodi trial was available to the defense and was in fact utilized extensively during cross-examination. Thus, while defense counsel now assert that they could have used Mbionwu's omission of

26. The defendants also cite to paragraph 17 of the affidavit in which Mbionwu states that he "went to New York City with Cindy Johnson and got over 500 grams of heroin from Sonny Odilibe." Defendants claim that this "refutes the absolute statement that Mbionwu never handled the drugs after the first few times." Defendants' Memorandum Concerning Prejudice at 12. The very next sentence of the affidavit, however, states that "Cindy Johnson transported the heroin back to Maryland and gave the heroin to Thaddeus Abu Shakir." Thus, far from refuting Mbionwu's testimony, paragraph 17 of the affidavit is a consistent illustration thereof.

27. The defendants also erroneously contend that Mbionwu's testimony and affidavit are inconsistent with respect to whether Zeki Sabbagh ever sent money on Mbionwu's behalf to Omega Electronics, another business through which Mbionwu laundered drug proceeds. Mbionwu testified that Sabbagh so assisted him on one occasion and that the amount involved was less than $30,000. (Tr. at 1693) In paragraph 24 of the affidavit, Mbionwu, without mentioning Sabbagh's name, recounts an incident in which he sent $40,000 through Omega to Greg Odilibe. Contrary to the defendants' argument, however, Mbionwu also testified that he made three to five visits to Omega himself and that on at least one of these trips he delivered money. (Tr. at 1691, 1692) Thus, the incident referred to in the affidavit simply could be one of Mbionwu's own visits to Omega. That this is indeed the case is demonstrated by Mbionwu's testimony in the Ike Ilodi trial. There Mbionwu clearly stated that he personally delivered the $40,000 to Omega. Government's Response to Defendants' Memorandum Concerning Prejudice, Exh. 3 at 620.

these names "very effectively in cross-examining him," Defendants Memorandum Concerning Prejudice at 16, defense counsel either intentionally or inadvertently passed on the opportunity to do so at trial. In either case, there is no proper claim of prejudice now. *See Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959), ("... [W]hen the very same information was possessed by defense counsel as would have been available were error not committed it would offend common sense and the fair administration of justice to order a new trial.").

Finally, as to the four names that Mbionwu did mention in his testimony but not in the affidavit, the defendants fail to explain how this impeaches Mbionwu's credibility. Clearly, a ten-page affidavit drafted for a limited purpose will not contain every item of information that is testified to over the span of four days. Mbionwu's trial testimony fills approximately 650 transcript pages. Accordingly, the omission of several names in the affidavit is not a material inconsistency upon which a claim of prejudice can be made. *See United States v. Douglas,* 964 F.2d 738, 742 (8th Cir.1992) ("Furthermore, the sworn affidavit was merely cumulative impeachment material which is not inconsistent with Solmonson's testimony, but simply omitted relevant facts.").[28]

### D. The Request for an Evidentiary Hearing

■ The defendants request an evidentiary hearing for the purpose of determining whether the government intentionally suppressed either or both of the affidavits. As defense counsel correctly assert in a letter to the court dated November 17, 1992, misconduct on the part of the government is a factor the court should consider in determining whether a Jencks Act violation warrants

a new trial. *See United States v. Schell,* 775 F.2d 559, 567 (4th Cir.1985).

■ An evidentiary hearing in this case, however, is unnecessary since the court can readily determine from the record before it that the government has not acted in bad faith. On January 27, 1992, several weeks before the start of trial, the government provided the defense with a voluminous amount of Jencks material including Mbionwu's and Obilo's cooperation agreements with the government. Government's Response to Defendants' Memorandum Concerning Prejudice, Ex. 1. In addition, the government at that time advised the defense of Obilo's and Mbionwu's prior testimony in the Ilodi trial and of Obilo's testimony in the Okolo trial. *Id.* As discussed above, the significance of the six-page Obilo affidavit and the ten-page Mbionwu affidavit pale in comparison to their testimony in these prior cases. It is therefore clear to the court that the government would not have deliberately withheld the affidavits given their minimal value to the defense and given the disclosures which the government did make. *See United States v. Hill,* 976 F.2d 132, 140 (3d Cir.1992), ("Given that the government turned over hundreds of pages of the agent's reports ... we cannot say that the court's finding that the nondisclosure of the Grand Jury testimony was unintentional was clearly erroneous. Under these circumstances, the government would have no real reason to conceal it.").[29]

For all of the foregoing reasons, the defendants' motion for a new trial and request for an evidentiary hearing will be denied.

Sentencing in this case will be on Friday, July 16, 1993, at 9:30 a.m.

■

---

28. *See also, United States v. Weidman,* 572 F.2d 1199, 1207 (7th Cir.1978) ("Since the statement did not pretend to be an exhaustive chronicle of the Burns Harbor mail fraud, there is simply no inconsistency between its omission of [the defendant's] name and those portions of [the witness's] subsequent testimony that may have implicated the appellant.").

29. The government's lack of bad faith in failing to produce the Mbionwu affidavit can also readily be seen by the fact that the government noted

the existence of the affidavit during the course of the trial. As discussed above, Assistant United States Attorney Zimmermann requested that the court arrange a telephone conference with the defense for the purpose of requesting permission to meet with Mbionwu in connection with the affidavit. As also discussed above, Zimmermann subsequently engaged in a brief discussion with the court concerning the affidavit in the presence of the defense.