**UNITED STATES**

v.

**Zeki A. SABBAGH**

**and**

**Jack Sabbagh, Petitioners.**

**Civil Action Nos. 97–CCB–926, 97–CCB–927.**

United States District Court, D. Maryland.

May 8, 2000.

immunity issue. *See Lewis,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708; *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

Fred Warren Bennett, Greenbelt, MD, for Petitioners.

Lynne A. Battaglia, United States Attorney, Stephen S. Zimmerman, Assistant U.S. Attorney, Greenbelt, MD, for Respondent USA.

## MEMORANDUM

BLAKE, District Judge.

On March 26, 1992, petitioners Zeki Sabbagh and Jack Sabbagh, father and son, were convicted by a federal jury of conspiracy to distribute one kilogram or more of heroin, and conspiracy to violate the money laundering laws of the United States. In addition, Zeki Sabbagh was convicted of being part of a second heroin distribution conspiracy and six substantive counts of money laundering.[1] Sentence was imposed on September 9, 1993. Now pending are the Sabbaghs' motions under 28 U.S.C. § 2255 to vacate and set aside their convictions and sentences and remand for a new trial. The Sabbaghs request an evidentiary hearing, arguing that counsel labored under multiple, actual conflicts of interest which adversely affected the representation received by the Sabbaghs at trial, thus constituting ineffective assistance of counsel under the Sixth Amendment as interpreted by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). They also argue that their Fifth Amendment Due Process rights were violated at sentencing because the trial judge failed to advise them of their right to appeal their sentences. For the reasons that follow, their motions will be denied.

## BACKGROUND

### I. TRIAL

Zeki A. Sabbagh, along with his two sons, Jack and Ayash Sabbagh, operated Saba Distributing, Inc. ("Saba Distributing") in New York City. Saba Distributing was a legitimate cosmetics exporting business with millions of dollars in annual sales. However, several Nigerian heroin dealers used Saba Distributing to launder substantial drug proceeds by purchasing cosmetics for export to Nigeria. These dealers were indicted during 1989–91. Zeki Sabbagh was indicted May 2, 1991 and Jack Sabbagh was indicted December 5, 1991.

At trial, which lasted 31 days, a number of dealers testified that they enlisted the help of the Sabbaghs to launder their drug proceeds. The primary method of money laundering was the sale of cosmetics for cash generated from heroin sales and the shipment of the cosmetics to Nigeria, where they were sold. Dealers also testified that they kept several hundred thousand dollars obtained from drug sales on account with the Sabbaghs, which was used either to purchase cosmetics or to pay couriers. There was testimony that Zeki Sabbagh packed $1 million in $100 bills in a cosmetics box; that on another occasion he packed cash in a detergent box; and that for a small fee, the Sabbaghs would exchange small bills for $100 bills which were safer and easier to hide and transport out of the country. One dealer testified that he had separate conversations with both Zeki and Jack Sabbagh in which he described his own drug trafficking activities as well as the roles of others, and that the Sabbaghs not only continued doing business with him after hearing this, but on one occasion Zeki Sabbagh informed him that another customer was looking for a buyer for his freshly imported heroin. Another testified that Zeki Sabbagh told him that in Janu-

---

1. The defendants were acquitted of several counts. The jury found Jack Sabbagh not guilty of the second heroin distribution conspiracy charge and Zeki Sabbagh not guilty of two substantive money laundering counts.

ary of 1990, U.S. Customs agents had personally informed Zeki Sabbagh that some of his Nigerian customers were heroin traffickers. The jury also heard a one-hour taped conversation between Zeki Sabbagh and an undercover law enforcement agent, as well as the agent's live testimony. Senior Judge Herbert Maletz, who presided at trial, described this and other evidence at length in a published opinion in which he denied the Sabbaghs' motion for a new trial. *United States v. Sabbagh*, 888 F.Supp. 714, 715–19 (D.Md.1993), *aff'd* 27 F.3d 564 (4th Cir.1994) (table).[2]

Zeki Sabbagh did not testify at trial, but Jack Sabbagh testified in his own defense that while he and his father had long been aware that Nigerian heroin traffickers had infiltrated the cosmetics industry, there was nothing about any of his Nigerian customers to arouse their suspicions. He also admitted that he and his father exchanged small denomination currency into $100 bills for clients and friends of clients. He was unable to explain, however, why supposedly legitimate businessmen would pay for such a service rather than having a bank do it at no charge. Jack Sabbagh also admitted that he and his father falsified bills of lading so as to omit cars, furniture and other items that were loaded onto their clients' cosmetics shipping containers. He testified that he did not be-

lieve there was " 'anything tremendously illegal' " about this practice. *Id.* at 718. The Sabbaghs' defense was based entirely on their lack of knowledge that the large amounts of cash they received from the heroin dealers represented drug proceeds. (Brief at 4.) Part of the government's otherwise substantial evidence of the Sabbaghs' knowledge consisted of the failure of Saba Distributing to file an Internal Revenue Service form 8300 every time it conducted a transaction in which $10,000 or more in cash was received, as required by the Internal Revenue Code, 26 U.S.C. § 6050I.[3] Additionally, one dealer testified that it was understood that the Sabbaghs would not file form 8300. *Sabbagh*, 888 F.Supp. at 716. The government also introduced evidence that a number of blank and partially completed form 8300s were discovered in Saba Distributing files. The Sabbaghs did not dispute that they failed to comply with the I.R.S. Form 8300 requirements. They argued rather that such failure was explained by their reliance on erroneous advice from one of their corporate attorneys, Abraham Badway, who was referred the question by their other corporate attorney, George Xylas, and thus should not be viewed by the jury as evidence of their knowledge of the source of the drug proceeds.

The Sabbaghs' respective trial counsel's presentation of their defense on the form

---

**2.** The present motion was originally submitted to Judge Maletz, who later recused himself because of ex parte communications to the court by a rabbi on the Sabbaghs' behalf. Judge Maletz concluded under 28 U.S.C. § 455 that his "impartiality might reasonably be questioned." (Order entered September 17, 1997.) The case was then reassigned to me.

**3.** The Sabbaghs claim in their memorandum that they were "charged" in the indictment with failure to file the Form 8300s. (Brief at 7.) While the indictment does contain an allegation that the Sabbaghs failed to file the forms, (Fourth Superseding Indictment, Paper 107, ¶¶ 4, 10(e)), that allegation was made in the context of the money laundering charges brought under 18 U.S.C. § 1956, as part of the manner and means of the conspir-

acy to launder the proceeds of unlawful activity. The indictment does not, however, charge the Sabbaghs with the crime of wilfully failing to file the forms, which generally, if not exclusively, would be brought under 26 U.S.C. § 7203 (entitled "Willful failure to file return, supply information, or pay tax."). *See, e.g., Bickham Lincoln–Mercury Inc. v. United States.*, 168 F.3d 790, 793 (5th Cir. 1999) (defendants charged with wilful failure to file form 8300 in violation of 26 U.S.C. § 7203); *cf.* 18 U.S.C. § 1956(a)(1)(A)(ii) (proscribing money laundering "with intent to engage in conduct constituting a violation of section 7201 [entitled 'Attempt to evade or defeat tax'] or 7206 [entitled 'Fraud or false statements'] of the Internal Revenue Code of 1986;" no mention of section 7203).

8300 issue is the subject of this motion. They claim that attorneys Richard M. Egbert, who represented Zeki·Sabbagh, and Richard Landes, who represented Jack Sabbagh, failed to call as witnesses Xylas, Badway, and Ayash Sabbagh, on account of Egbert's and Landes's multiple conflicts of interest; they also allege that Xylas managed Zeki Sabbagh's defense from behind the scenes. These alleged conflicts and their deleterious effects on the Sabbaghs' representation form the basis of their ineffective assistance of counsel claims. The events surrounding their failure to file the forms must therefore be recounted in some detail.

## II. CONFLICTS OF INTEREST ARISING FROM ERRONEOUS LEGAL ADVICE PERTAINING TO I.R.S. FORM 8300

In February 1990, well over a year before Zeki and Jack Sabbagh were indicted, U.S. Customs agents, in the course of an investigation of stolen cars, confronted Jack and Ayash Sabbagh at their Brooklyn office. According to Jack Sabbagh's testimony at trial, Jack and Ayash Sabbagh readily admitted to Customs that Saba Distributing was conducting cash transactions involving $10,000 or more. The customs agents informed them that they believed some form should have been filled out for these transactions, but were not sure about which form was required. They advised Saba Distributing to consult with their attorneys or accountants.

Ayash Sabbagh contacted Saba's attorney, George M. Xylas, by faxing a copy of a Cash Transaction Report form ("CTR"), a customs document, which Jack Sabbagh had obtained from a bank. Xylas had no idea what the form was, and referred the question to attorney Abraham Badway. Badway located form 8300 but was not sure if it was the correct form. He faxed

the front side of an 8300 to Saba Distributing, but did not fax the back of the form which contained instructions on filling out the front side. Instead, Badway instructed Saba Distributing by way of a telephone call to Jack Sabbagh that Saba Distributing should have its customers sign the bottom of the form and that Saba Distributing should maintain the forms on file.[4] Form 8300, however, is required to be filed with the I.R.S. within 15 days of any cash transaction (or multiple related transactions) totaling $10,000 or more. 26 C.F.R. § 1.6050I–1(e) (1990); 51 Fed.Reg. 31610, 31613 (1986) (announcing final regulation). Moreover, it is to be signed by the business receiving the cash, and not by the customer delivering it. Saba Distributing maintained the forms as instructed, although it did not treat the task as a "top priority," sometimes forgetting to complete the form at all. (Tr. at 4255.) It is undisputed that Badway's advice concerning the 8300 forms was miserably wrong. (Brief at 9–11; Opp. at 4–5.)

When Zeki Sabbagh was arrested on May 2, 1991, he asked Xylas to be his defense counsel. Xylas then asked Badway to be Zeki Sabbagh's lead counsel. Xylas and Badway entered appearances at Zeki Sabbagh's initial arraignment on May 17, 1991, with Badway limiting his own appearance to "arraignment only." (Papers 24, 25.) Badway spoke on Zeki Sabbagh's behalf at the arraignment, and later contacted attorney Richard M. Egbert, initially with the notion that he and Egbert could act as Zeki Sabbagh's co-counsel. Egbert, however, rejected this proposal because of the conflict of interest arising from Badway's erroneous legal advice to Saba Distributing regarding the 8300 forms. (Brief at 12.) Egbert entered his appearance and thereafter represented Zeki Sabbagh through the end of

---

4. Jack Sabbagh first testified that Badway had advised him that Saba Distributing should file the forms once a year at tax time, conceding that no forms had been filed until after Zeki Sabbagh's arrest. (Tr. 4631, 4640.)

After a lunch recess, however, he claimed this testimony was mistaken and retracted it, explaining that Badway had told him merely to keep the forms on file at the offices of Saba Distributing. (Tr. 4649, 4653.)

trial. Neither Xylas nor Badway ever again appeared in court on Zeki Sabbagh's behalf. The Sabbaghs claim, however, that Xylas continued to direct Zeki Sabbagh's defense "behind the scenes in a consultive role and as a facilitator." (*Id.*)

Additionally, during the pendency of this proceeding, Xylas allegedly acted as counsel in a contemporaneously filed civil forfeiture action based on the same facts as the indictments against Zeki and Jack Sabbagh, which was settled, resulting in the forfeiture of property in which Saba Distributing, Ayash, Jack and Zeki Sabbagh all had an interest (as did their spouses and another son, Reuben). The Sabbaghs' allegation, however, fails to explain specifically who was Xylas's client in this action. (Brief at 33.) Xylas and Badway also had represented Ayash Sabbagh in connection with a March 30, 1990 grand jury subpoena relating to the "shipment of any automobiles transported to Nigeria by or on behalf of Jazz International Beauty Supply," a company owned by the Sabbaghs. (Brief at 17–18, Ex. B.) Given the date of the subpoena, this representation apparently occurred long before Zeki Sabbagh's May 2, 1991 arrest, and the Sabbaghs do not claim otherwise.

The government served upon Zeki Sabbagh second, third and fourth superseding indictments. Egbert represented him at all three arraignments. In the Fourth Superseding Indictment, dated December 5, 1991, Jack Sabbagh was for the first time named as a defendant. Jack Sabbagh retained Richard Landes as counsel. Landes was Xylas's lone partner in the firm Xylas & Landes. The Sabbaghs now claim that Landes surreptitiously agreed to cede control over Jack Sabbagh's defense to Zeki Sabbagh's attorney Egbert; and, by implication, to Landes's partner Xylas, who as previously explained allegedly represented Zeki Sabbagh from behind

the scenes.[5] At arraignment the Sabbaghs pleaded not guilty on December 20, 1991, and trial commenced February 3, 1992.

At some point during the course of trial Badway and Xylas retained their own counsel, who apparently advised them each to assert their Fifth Amendment privilege against self-incrimination if called to testify regarding the form 8300 advice. Near the end of trial, on March 18, 1992, Egbert requested permission from the court to testify as to previous conversations he had with Xylas and Badway concerning the form 8300 advice, which occurred several days after Zeki Sabbagh's arrest. Egbert informed Judge Maletz that Xylas and Badway had recently told him they would refuse to testify on Fifth Amendment grounds, stating that "[i]t doesn't come as a complete surprise to me based upon the factual predicate that I know exists in this case." (Tr. at 5185.) He conceded that, had he anticipated this circumstance prior to trial, he should have done something about it by giving his client the option of having him withdraw "in order to get my testimony in this courtroom." (Tr. at 5190.) Egbert explained, however, that he was not faced with that factual circumstance: "It certainly couldn't have been anticipated that these people would have taken the Fifth when they were telling me all along and in fact telling the Court that they were going to testify. Badway told the magistrate that the reason he had a conflict was he was going to be called as a witness. I had no idea that he was going to at the last minute fail to testify." (*Id.*) Egbert argued that he could testify as to this limited area of inquiry without having to withdraw as counsel, arguing that because the government had cross-examined Jack Sabbagh at length on how preposterous it was that a lawyer would give such faulty advice, "Jack Sabbagh is kind of left

5. Perhaps in an attempt to paint Xylas and Landes with sinister undertone, the Sabbaghs' brief repeatedly labels their partnership "The Firm," apparently a reference to the John Grisham book and film by the same name

about a corrupt law firm which launders money for organized crime and will do just about anything for a fee regardless of legality or ethics. If such innuendo is intended, it is not appropriate, and will be disregarded.

out there having made these statements, the lawyers won't come in and admit what they did, and the only available witness who knows and who was there to listen to these admissions is me." (*Id.* at 5198.) The court refused to let him testify, however, reasoning that the proffered testimony was not vital to the case, and that Egbert had failed to make the substantial showing necessary under relevant case law for an advocate to take the stand as a witness for his client. (*Id.* at 5200.) [6]

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON ACTUAL CONFLICT OF INTEREST

■ A defendant asserting a violation of the Sixth Amendment by ineffective assistance of counsel typically bears a substantial burden. The defendant must show both incompetence—that counsel's performance fell below "an objective standard of reasonableness"—and prejudice— "the reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). But where counsel is shown to have an actual—not merely potential—conflict of interest, the performance element is satisfied. *Burket v. Angelone*, 208 F.3d 172, 184 (4th Cir.2000). Then, with respect to the prejudice element, if an actual "conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defendant is presumed and a new trial must be ordered." *United States v. Tatum*, 943 F.2d 370, 375. (4th Cir.1991) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980)).

"When the attorney is actively engaged in legal representation which requires him to account to two masters, an actual conflict exists when it can be shown that he took action on behalf of one. The effect of his action of necessity will adversely affect the appropriate defense of the other." *Tatum*, 943 F.2d at 376. But if the attorney "did not choose between conflicting interests, the simple possibility of a conflict would not support a claim of a Sixth Amendment violation." *United States v. Magini*, 973 F.2d 261, 264 (4th Cir.1992). "The two requirements, an *actual conflict* of interest resulting in an *adverse effect* on counsel's performance, are often intertwined, making the factual analyses of them overlap." *Burket*, 208 F.3d 172, 184 (internal quotation marks omitted)(quoting *Tatum*, 943 F.2d at 375)(emphasis in original). *See also United States v. Swartz*, 975 F.2d 1042, 1047–48 (4th Cir.1992) (reviewing standards for actual conflict claims).

■ Section 2255 provides for an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. A federal court in a habeas proceeding must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to relief. When a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary. *Magini*, 973 F.2d at 264.

### A. Attorney George Xylas

■ The Sabbaghs claim that "Attorney Xylas' affirmative decisions to enter an official written appearance as Zeki Sabbagh's counsel, to engineer Zeki Sa-

---

**6.** The government claims that Judge Maletz held the statements inadmissible because, having been made several days after Zeki Sabbagh's arrest, they were outside the scope of the charged conspiracy. (Opp. at 5.) Although that was part of the government's argument, (Tr. at 5195), and Judge Maletz had earlier expressed concern on the point,

(*Id.* at 5192), his ruling did not embrace that reasoning. (*Id.* at 5200.) Moreover, Judge Maletz had previously appeared satisfied with Egbert's explanation that, although the statements were made post-arrest, they related to the Sabbaghs' reliance upon erroneous advice of counsel within the time period of the charged conspiracy. (*Id.* at 5192.)

bbagh's choice of counsel through Attorney Badway and to engineer Jack Sabbagh's choice of counsel by referring Jack Sabbagh to his partner (Landes) were all made with an eye toward concealing his own wrongdoing." (Brief at 22.) They point out that the docket reveals no official withdrawal of Xylas's appearance at Zeki Sabbagh's first arraignment, and claim that although Badway's name has been crossed off the docket sheet (presumably by the docket clerk), Xylas's name has not. But an examination of the original docket sheet shows that Xylas's name indeed has been crossed off, as well as Badway's. For unknown reasons, perhaps an error in copying, the document submitted to this court as Exhibit A to the Sabbaghs' brief reveals only a faint, small part of the line placed through Xylas's name, which becomes obvious only when compared with the original docket sheet; the line through Badway's name, in contrast, appears the same on both original and copy.

Egbert's appearance was entered officially on June 5, 1991, (Paper 34), but the Sabbaghs concede that Egbert "was formally retained by Zeki Sabbagh within 10 days of [his May 2, 1991 initial] indictment." (Brief at 12; *see also* Tr. at 5186.) The record contains no evidence that Xylas directed Zeki Sabbagh's defense from behind the scenes, and the Sabbaghs' brief alleges no facts leading to an inference that such representation may have occurred, but only conclusions to that effect. The Sabbaghs do allege that Xylas and Badway were copied in one letter from Egbert to Zeki Sabbagh referring to the second superseding indictment issued shortly after Egbert was retained, Egbert's review of the indictment, and his plans to represent Zeki Sabbagh at arraignment. (Brief at 20; Ex. C.) To the extent it tends to show anything, it is that Egbert, not Xylas, seems to have been taking charge of Zeki Sabbagh's defense following Xylas's appearance at the initial arraignment. The Sabbaghs also have attached as Exhibit E copies of checks paid to Landes and signed by Xylas as trustee of Saba Distributing corporate accounts, but they do not explain how that should lead to an inference that Xylas was representing Zeki Sabbagh. It shows merely that legal fees were being paid from Saba Distributing corporate accounts for the benefit of a corporate principal, and the fact that Xylas signed them in his capacity as trustee merely confirms that he continued to represent Saba Distributing on corporate matters. Exhibit H presents copies of two checks payable to "Xylas and Landes" for "Zeki and Jack's Legal Fees," but the account holders' names are not printed on the checks and the signatures are illegible. And finally, Exhibit J is an invoice which refers to a dinner some two months following the Sabbaghs' convictions where Egbert, Landes and Xylas apparently discussed "sentencing, post-trial strategy, forfeitures, etc." Given that the Sabbaghs have alleged that Xylas represented them and/or their companies in a forfeiture action, this apparent sharing of information does not appear improper, and it may well have been sound strategy to coordinate the defenses of the various charges against the Sabbaghs.

Responding to the government's challenge to their bare conclusion that Xylas represented Zeki Sabbagh from behind the scenes, (Opp. at 9), the Sabbaghs merely state that they will introduce evidence at an evidentiary hearing that Xylas participated in Zeki Sabbagh's defense. (Reply at 6.) But that is no substitute for the requirement that they "allege[ ] facts which, if true, would entitle [them] to relief." *Magini,* 973 F.2d at 264 (holding that evidentiary hearing required where petitioner "point[ed] to several specific facts ... suggest[ing] an actual conflict" in alleging that attorney, who had engaged in questionable accounting regarding petitioner's financial assets, persuaded her to plead guilty and failed in the plea agreement to negotiate a forfeiture provision in order to ensure collecting his own fee); *see also Beaver v. Thompson,* 93 F.3d 1186, 1191 (4th Cir.1996) (affirming district

court's refusal to hold evidentiary hearing where petitioner failed to plead facts which, if true, would entitle him to relief); *Barker v. United States*, 7 F.3d 629, 633 n. 3 (7th Cir.1993) (hearing not required if allegations are mere conclusions); *United States v. Fishel*, 747 F.2d 271, 273 (5th Cir.1984) (no hearing required where charge that government agent lied was conclusory and speculative).

Because there is nothing either in the record or in the Sabbaghs' motion and exhibits pertaining to facts creating an inference that Xylas represented Zeki Sabbagh beyond his initial arraignment, any conflict that might have existed between Xylas's and Zeki Sabbagh's interests would not be cognizable under an ineffective assistance of counsel claim for the simple reason that Xylas was not Zeki Sabbagh's trial counsel. *See United States v. Martini*, 31 F.3d 781, 782 (9th Cir.1994) ("For a lawyer's advice to constitute ineffective assistance of counsel, it must come from a lawyer who is representing the criminal defendant or otherwise appearing on the defendant's behalf in the case."); *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir.1994) (advice from nonappearing attorney, who has not been retained by the defendant to help prepare his defense, is not covered by constitutional right to effective assistance of counsel).

### B. *Attorney Richard Egbert*

█ The Sabbaghs claim that Egbert was encumbered throughout the trial by an ongoing conflict because he knew or should have known that he could have been an effective witness for the defense in connection with the form 8300 issue. At most this claim shows what in hindsight may have been a poor strategic choice by Egbert in his reliance on Xylas's and Badway's promises to testify; it does not show, however, that Egbert made a choice between his own and his client's interests as required to show an actual conflict. *Tatum*, 943 F.2d at 376.

In *United States v. Thomas*, 114 F.3d 228, 253 (D.C.Cir.1997), the defense attorney's former client was a key government witness in the defendant's drug conspiracy prosecution. The witness had been involved in the same conspiracy charged against the defendant. *Id.* at 240 and n. 3. The witness had told the attorney a lie during the prior representation but in order to testify in the current trial had waived the attorney-client privilege as to statements made to the attorney. The defendant argued that if testimony reflected that both the defendant and witness had been represented by the same attorney, " 'Mafia Style,' " the jury would have thought that the defendant and witness were interrelated. *Id.* at 253. Thus, counsel was faced with the choice of either risking creating that connection, or not impeaching his former client and losing the opportunity to discredit a key government witness. The court held that no actual conflict of interest was posed, for the choice was not between the client's interest and someone else's, but rather how best strategically to advance the client's interests.

In the present case, Egbert represented to Judge Maletz that he relied on Badway's and Xylas's representations that they would testify. (Tr. at 5190.) He said he had told Badway during their first meeting regarding the case, when he discovered the conflict and the faulty form 8300 advice, that he expected Badway to testify. (*Id.* at 5198.) He said that Badway's advice had been "misinformed, inappropriate, poorly researched—not researched at all, and in fact was advice which was erroneous." (*Id.* at 5187.) Judge Maletz agreed, stating, "I think the record so indicates." (*Id.*) Rather than shield Badway from criticism, Egbert questioned Jack Sabbagh on Badway's advice. (*Id.* at 4796–97.) Egbert also attempted, albeit unsuccessfully, to persuade the court to let him testify. Thus, no actual conflict of interest has been demonstrated, nor any adverse effect on Egbert's representation of Zeki Sabbagh as a result

of a choice made by Egbert between conflicting loyalties. *Cf. United States v. Ricks,* 776 F.2d 455, 466 (4th Cir.1985) (fact that lawyer's records had been subpoenaed over his objection and would be introduced at trial did not suggest that the lawyer was less than zealous in representing defendant), *aff'd on other grounds on reh'g,* 802 F.2d 731 (4th Cir.1986) (en banc); *Beets v. Collins,* 986 F.2d 1478, 1486 (5th Cir.1993) (finding no actual conflict where attorney who did not anticipate becoming a necessary defense witness "was never faced with a decision that might call into question his loyalty to [his client's] cause"), *aff'd on other grounds on reh'g sub nom, Beets v. Scott,* 65 F.3d 1258, 1260, 1277 (5th Cir.1995) (en banc).

It might be argued (although the Sabbaghs do not) that once it became clear that Xylas and Badway would not testify, Egbert then had a duty under state law to withdraw as counsel. *See* Md. R. Prof. Cond. 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness. . . .") Given Egbert's argument to Judge Maletz regarding Badway's apparent intention to testify, it does not appear that, before trial, Egbert was likely to become a necessary witness. Assuming that he did become a "necessary" witness when Badway and Xylas announced their intention to refuse to testify, that alone would not create an actual conflict between Egbert's and his client's interests. It could be seen as raising two potential conflicts, but the mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719. One potential conflict may have arisen between Zeki Sabbagh's interest in having Egbert testify and Egbert's interest in not testifying; and the other between Egbert's interest in continuing to collect his fees versus his loss of fees due to withdrawal. As to the first potential conflict, Egbert's strenuous argument to Judge Maletz regarding his desire to testify negates any inference that he wished not to, and nothing in the record or in the Sabbaghs' motion raises

the specter that his argument was a subterfuge. *See Thomas,* 114 F.3d at 253 (no actual conflict where there was no showing that attorney had interest in not testifying for client). As to the second potential conflict, the Sabbaghs have averred generally in another context that this was a "fee rich case," (Brief at 23 n. 5), but that observation, even if true, is without more insufficient to raise an inference that Egbert failed to withdraw as counsel because of his own pecuniary interest; indeed, at the time he would have withdrawn the 31 day trial was almost at its end.

The Sabbaghs allege that because Badway referred Zeki Sabbagh to Egbert, and because the two attorneys had a history of referring clients to each other, Egbert had reason to protect Badway from becoming a witness. (*Id.* at 39.) But as just discussed, Egbert strenuously argued for the court to allow him to testify as to Badway's advice; moreover, Badway's failure to testify was due to his choice to follow the advice of his own retained counsel—not by Egbert's failure to attempt to call him as a witness. If such a slender allegation, without more, were taken to indicate a conflict of interest, then any time an attorney received a referral from an attorney with a conflict, that conflict would be deemed imputed to the new attorney. Under disciplinary rules an attorney owes a duty of loyalty to her client, not the referring attorney. Md. R. Prof. Cond. 1.7. It will not be inferred that that duty has been set aside merely because the client was referred by an attorney with a conflict.

The Sabbaghs next allege that a $45,000 payment from Jack Sabbagh to Egbert, structured ostensibly as a loan from Jack to his father Zeki for legal expenses, was really a sham transaction designed by Xylas to conceal the true nature of the transaction— that of Jack's paying for Zeki's legal expenses. (Brief at 23, 38–39; Ex. K.) The loan document is dated May 14, 1991, nine days after Zeki Sabbagh's arrest and over six months before Jack Sa-

bbagh's arrest. The Sabbaghs present no facts showing that this was a sham transaction, such as whether the payments, set to commence on July 15, 1991, were in fact made—information that would be clearly within their knowledge—but only a bare conclusion. Additionally, even assuming that Jack Sabbagh had paid money toward his father's defense; and further assuming that his doing so gave rise to conflicting duties on Egbert's part; the Sabbaghs point to no event during the trial where Egbert favored Jack Sabbagh's interests over those of Zeki Sabbagh's. Furthermore, if this were really a sham transaction, then Zeki Sabbagh would have been a participant in the sham, and it is difficult to see why a conflict he helped create would not then be deemed waived. *See Swartz,* 975 F.2d at 1048–49 (Sixth Amendment right to conflict-free counsel may be the subject of waiver).

## C. *Attorney Richard Landes*

 The Sabbaghs argue first that Xylas, by virtue of his involvement in the form 8300 advice, had an actual conflict that should be imputed to his partner, Landes, who represented Jack Sabbagh. But the only involvement alleged is that Xylas referred the problem to Badway, who then gave the erroneous advice. (Brief at 9.) Jack Sabbagh's own testimony described the same scenario, (Tr. at 4626–27), and the trial transcript reveals no situation where Xylas's role in the form 8300 advice was otherwise characterized. Xylas's decision to refuse to testify on Fifth Amendment grounds does seem to contradict this scenario, but his refusal to testify based on what appears to be an erroneous belief that he did something wrong does not turn a potential conflict

into an actual one. *See, e.g., United States v. Jones,* 900 F.2d 512, 519 (2d Cir.1990) ("Allegations of wrongdoing alone cannot rise to the level of an actual conflict unless the charges have some foundation."). Additionally, no adverse effect on Landes's representation appears since Xylas's testimony of the mere fact of referral to Badway would have been of little if any help to the Sabbaghs' case; and he could not have testified as to what the Sabbaghs told him Badway had advised them because that would have been excluded as hearsay.[7] Moreover, in Landes's closing argument, rather than try to protect Xylas by attempting to justify Badway's advice, Landes characterized that advice as "cockamamie" and "completely wrong." (Tr. at 5516; *accord* Brief at 13.)

The Sabbaghs' second argument is that Landes ceded control over Jack Sabbagh's defense to Egbert. They argue that because (1) Egbert conducted most of the cross-examination of government witnesses, (2) Landes made no attempt to shift blame from Jack to Zeki or Ayash Sabbagh, and (3) Ayash Sabbagh was never called as a witness, both an actual conflict and resulting adverse effects on Jack Sabbagh's representation by Landes have been demonstrated. The government claims, however, that the defendants put on a unified defense that they did not know their clients were drug dealers, and that Egbert was the more experienced counsel so it was reasonable for him to take the lead and perform most of the cross examination to avoid confusion and repetition; moreover, although Landes may not have cross-examined government witnesses, he extensively questioned defense witnesses, (Tr. at 4873–4950, 5172–

---

7. There are two possible forms of hearsay in Xylas's proposed testimony: the statement (advice) from Badway to Jack Sabbagh, and the statement from Jack Sabbagh to Xylas. *See* Fed.R.Evid. 805 (if testimony contains hearsay within hearsay, each part of the combined statements to be admissible must conform with an exception to the rule excluding hearsay). Judge Maletz allowed Jack Sa-

bbagh to testify as to Badway's advice, not to prove the truth of the matter asserted but to show its effect on Jack Sabbagh's state of mind, (Tr. at 5194), which is not hearsay under the Federal Rules of Evidence's hearsay definition. Fed.R.Evid. 801(c). *Cf.* Reply at 5–6. But Xylas's recounting of Jack Sabbagh's report to Xylas regarding Badway's advice would be inadmissible hearsay.

5182, 5212–5221), as well as his own client. (Tr. at 3979–4302, 4705–4759.) Given that Saba Distributing was a family-run business, it seems likely that a defense of blame-shifting among the defendants would have had little chance of success—indeed, it seems implausible—and the Sabbaghs have suggested no colorable reason to think otherwise. *See United States v. Abner,* 825 F.2d 835, 844 (5th Cir.1987) ("An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." (internal quotation marks omitted) (quoting *Foxworth v. Wainwright,* 516 F.2d 1072, 1080 (5th Cir. 1975))); *Holloway v. State,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978) ("A common defense often gives strength against a common attack." (internal quotation marks omitted) (quoting *Glasser v. United States,* 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (dissenting opinion of Frankfurter, J.))). As to shifting the blame to Ayash Sabbagh, who was unindicted, doing so would seem much more likely potentially to have inculpated him than to have exculpated the defendants. The Sabbaghs have pointed to no place in Jack Sabbagh's testimony where he himself tried to shift the blame to his brother Ayash, so there appears no basis for arguing that Landes should have acted, in effect, to contradict his client's own testimony that father and sons all acted without knowledge of the source of the cash they received from the Nigerian heroin dealers; the same reasoning applies to shifting the blame to Zeki Sabbagh.[8] Jack Sabbagh in his testimony repeatedly used the pronoun "we" when describing who took certain actions on behalf of Saba Distributing. Calling Ayash Sabbagh as a witness also would have opened the door for prosecution questioning of Ayash Sabbagh's own possible involvement in the money laundering conspiracy (if for no other purpose than to attack his credibility, *see* Fed.R.Evid. 608), which might have reflected poorly on his brother and father. Or, he might have refused to answer certain questions on Fifth Amendment grounds. Thus, on balance there appear to be sound strategic reasons for not having called Ayash Sabbagh as a witness and

---

**8.** Jack Sabbagh testified on cross-examination as follows:

Q. Were you the export manager for Saba Distributing as well?

A. Being in the family business you could really name yourself anything you want. But, yes, you could consider me export manager.

Q. And I believe you have also testified at some length that you work very closely with your father?

A. Yes, hand in hand.

Q. In every aspect of the business? .

A. Almost every aspect, yes.

Q. You could do whatever he could do, in other words?

A. Yes.

Q. You were virtually partners, is that fair to say?

A. It's a family business, the whole family is a partner.

Q. But there were things that he did that you didn't do or vice versa?

A. Well, we kind of separated each and every person's job. If it came a time when my father was not in the office, yes, I can do—he has trained me to do whatever he was doing.

Q. You keep him informed of what you are doing, don't you?

A. I try.

Q. He keeps you informed of what he is doing I assume?

A. He tries.

Q. Certainly if there are significant conversations or significant events that occur in the business, you are going to tell each other?

A. Yes.

(Tr. at 4330–31.)

Q. Would you always put your name on [a sales invoice] if you handled [the sale]?

A. On occasions.

Q. Sometimes yes, sometimes no?

A. Sometimes yes, sometimes no. It wasn't really an important part of our business who made the sale.

Q. It wasn't an important part of the business?

A. No. Because there is [sic] only three people that can make the sale. Either me, my father or brother Ayash.

Q. Just like the 8300s, not a real important part?

A. Exactly.

(Tr. at 4426.)

for not attempting to shift the blame to him or to Zeki Sabbagh, and few if any in favor of doing either. Given this scenario, it is simply implausible to infer that Landes's representation of Jack Sabbagh was adversely affected by an actual conflict.[9]

This conclusion is not undermined by the allegation that an actual conflict arose when some of Landes's legal fees were paid from Saba Distributing corporate accounts in which Ayash Sabbagh had an interest, nor by the allegation that Ayash once paid Landes $10,000 directly for Jack Sabbagh's defense. (Brief at 21, Exs. E–I.) The Sabbaghs cite to *United States v. Gotti*, 771 F.Supp. 552, 562 (E.D.N.Y. 1991), for the proposition that "[b]enefactor payments potentially strike at the heart of the attorney-client relationship and thus at the heart of the adversarial process." (Brief at 38–39.) But in *Gotti* the benefactor payments had been made by the alleged head of an organized crime RICO conspiracy in furtherance of that conspiracy, and the attorneys who had received the payments as "house counsel" to the Gambino organized crime family were disqualified in advance of trial because

those payments would be used as evidence of the conspiracy. *Gotti*, 771 F.Supp. at 553. This case is not even remotely similar. It might be that the potential for conflict arguably violated some disciplinary rule, but that is not the question before me. *See United States v. Gallegos*, 39 F.3d 276, 279 (10th Cir.1994) (holding that violation of disciplinary "rules will not in itself constitute a constitutional violation under *Cuyler* and related cases").

Thus, no actual conflict leading to an adverse effect on counsel's representation has been shown or alleged with respect to any of the attorneys in this case, and the Sabbaghs are not entitled to an evidentiary hearing. I have reviewed and considered the additional arguments made in the Sabbaghs' brief regarding actual conflicts and found them meritless.[10]

## II. FAILURE TO ADVISE PETITIONERS OF RIGHT TO APPEAL

After sentencing Zeki and Jack Sabbagh, the court advised them as follows: "I do finally want to indicate to Mr. Zeki Sabbagh and Mr. Jack Sabbagh you have, as you undoubtedly know, an absolute

9. It also seems highly unlikely that Ayash Sabbagh would have been allowed over a hearsay objection to testify as to Badway's advice regarding form 8300. According to both the trial transcript and the Sabbaghs' brief, Badway communicated his advice to Saba Distributing in a telephone call to Jack Sabbagh, (Tr. at 4237, Brief at 9), and "Saba [Distributing] relied exclusively on Jack Sabbagh's accurate republication of Attorney Badway's phone advice for purposes of dealing with this new administrative chore. (Tr. 4237, 4844, 4846)." (Brief at 9.)

10. For example, the Sabbaghs assert that their accountant should have been called as a witness, but have pointed to no conflict between the accountant and their counsel. (Brief at 20.) They claim that Landes "permitted Jack Sabbagh to be tried for 31 days within approximately 6 weeks of indictment," yet in the next sentence concede that Landes filed a pre-trial motion for continuance, which was denied. (*Id.* at 19.) They also argue that Landes made no attempt to negotiate a plea agreement for Jack Sabbagh. (*Id.*)

The government explains, however, that Landes's failure to do so was primarily the result of aborted plea negotiations with Jack Sabbagh's father, where Zeki Sabbagh rejected a plea offer by the government which would have resulted in a short jail sentence for Zeki Sabbagh and no charges being brought against Jack Sabbagh. After Jack Sabbagh was indicted, the Sabbaghs, on the government's understanding, jointly retained Joseph Armao as counsel to pursue the possibility of joint pleas. These negotiations also proved unsuccessful. (Opp. at 14.) The Sabbaghs failed to respond to the government's explanation in their reply brief. The Sabbaghs' additional claim that the government knew or should have known about the alleged conflicts yet failed to inform the court is also rejected for (1) the lack of, as the foregoing analysis has shown, any actual conflicts, and (2) the lack of any evidence either in the record or in the Sabbaghs' allegations leading to an inference that the government knew or should have known of the alleged conflicts. (Brief at 27–28.)

right of appeal. In the event you lack funds to take an appeal, you simply have to file a memorandum with the court indicating that you would like to proceed in what we call in forma pauperis and the court will, of course, appoint an attorney for each of you." (Sent. Tr. at 175.) The Sabbaghs in fact filed notices of appeal of both their sentences and convictions.[11] (Opp., Exs.1–3.) They now argue that the notice of their right to appeal was insufficient under Fed.R.Crim.P. 32(a)(2) [12] ("Rule 32") because it did not specifically say they had a right to appeal their *sentence.*

At the time of the Sabbaghs' trial Rule 32(a)(2) provided in relevant part:

> After imposing sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the defendant of his right to appeal. . . .

In *Peguero v. United States,* 526 U.S. 23, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999), the Supreme Court held that a district court's failure to advise a defendant of his right to appeal his sentence, as required by Rule 32(a)(2), did not entitle him to collateral relief when he in fact was aware of his right. *Id.* at 26, 119 S. Ct. at 964–65. The Court rejected the "per se" approach followed by some Circuits, including the Fourth,[13] adopting instead a harmless error standard. In *Peguero,* although the district court clearly violated Rule 32(a)(2), no prejudice resulted, as the defendant had "full knowledge of his right to appeal" from other sources. *Id.* at 27, 119 S.Ct. at 964–65.

■ *Peguero* compels a finding that the Sabbaghs are not entitled to collateral relief. First, Judge Maletz informed them of their "absolute right of appeal;" the fact that he did not use the word "sentence" is of no moment. Neither the parties' nor the court's research has revealed a case where a judge's notice to a defendant of her right to appeal was held or even argued not to constitute notice to appeal both the conviction as well as the sentence imposed, and the cases discuss generally the "right to appeal," not the right to appeal conviction and sentence.[14] Accord-

---

**11.** Ultimately, the Sabbaghs decided not to pursue any sentencing issues on appeal.

**12.** In 1994 this rule was recodified at Fed. R.Crim.P. 32(c)(5), and although the wording was revised slightly, no substantive change was intended. *See* Adv. Comm. Note.

**13.** In *Paige v. United States,* 443 F.2d 781, 782 (4th Cir.1971), the Fourth Circuit held that a comment by the judge on the defendant's right to appeal a separate state court conviction could not suffice for notice by the court to the defendant of his right to appeal the federal conviction:

> Rule 32(a)(2) is specific in its command. It is obviously designed to insure that a convicted defendant be advised precisely of his right to appeal and to avoid a situation where the Government claims a defendant is otherwise aware of his right to appeal while the defendant denies such knowledge.

The Fourth Circuit has followed this "per se" rule in two recent unpublished opinions, *United States v. Talbott,* 92 F.3d 1184, 1996 WL 453469 at *2 (4th Cir.1996), and *United States v. Shulman,* 85 F.3d 618, 1996 WL 245269 at *1 (4th Cir.1996). *Peguero* abrogated those opinions applying the per se rule. Peguero, 526 U.S. at 29, 119 S.Ct. at 963.

**14.** The Sabbaghs seek to find such a distinction in the text of the revised rule, now codified at Rule 32(c)(5) (emphasis added):

> After imposing sentence in a case, which has gone to trial on a plea of not guilty, the court must advise the defendant of the right to appeal. *After imposing sentence in any case, the court must advise the defendant of any right to appeal the sentence* . . . .

The first sentence of the revised rule, Rule 32(c)(5), is identical to the Rule 32(a)(2) provision regarding notice of right to appeal. The purpose of the amendment, which added the underlined second sentence, was to clarify that, while "the court may, but is not required to, advise a defendant who has entered a guilty plea, nolo contendere plea, or conditional guilty plea of any right to appeal (such as an appeal challenging jurisdiction)," the court nevertheless has the duty to advise such a defendant of any right to appeal the sentence imposed. "Although the provision has been rewritten, the Committee intends no substantive change in practice." Adv. Comm. Note on 1994 Amend. Rule 32. In any event, even if the revised rule did work the change implied by the Sabbaghs' argument, it was the former Rule 32(a)(2) which applied at the time they were sentenced.

ingly, there was in fact no violation of Rule 32(a)(2). Additionally, even if Judge Maletz's statement could somehow be considered a violation of Rule 32(a)(2), the Sabbaghs have failed to show any prejudice they suffered. They possessed knowledge of the right to appeal their sentences, as evidenced by the filing of Notices of Appeal from their conviction and the imposition of their sentence a mere five days after sentencing. (Opp.Exs.1, 2). *See also Soto v. United States*, 185 F.3d 48, 50 (2d Cir.1999) (holding that in light of *Peguero*, the government can demonstrate harmlessness by a showing that the defendant actually exercised his right of appeal).

Thus, under the harmless error rule announced in *Peguero*, the Sabbaghs are not entitled to collateral relief, as they possessed knowledge of their right to appeal despite the alleged violation of Rule 32(a)(2). *Peguero*, 526 U.S. at 27, 119 S.Ct. at 964–65.

### III. CONCLUSION

The Sabbaghs' claims of ineffective assistance of counsel fail because they have neither identified in the record, nor alleged facts outside the record, leading to an inference that their counsel were encumbered with an actual conflict of interest which adversely affected their representation. Additionally, they had knowledge of their right to appeal their sentences, as evidenced by their timely appeals.